IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

RAYNARD JACKSON,

                    Plaintiff,

      v.

JOAN GERL, GARY BOUGHTON,
TODD SAWINSKI, DANE ESSER,
THOMAS BROWN, JANET FISCHER,
LEONARD JOHNSON, ROBERT SHANNON,
JEFF REWEY, THOMAS TAYLOR,
RICHARD SCHNEITER, PETER HUIBREGTSE,

                  Defendants.[1]

OPINION and ORDER

07-cv-656-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

On March 26, 2005, prison officials at the Wisconsin Secure Program Facility used a stinger grenade to extract plaintiff Raynard Jackson from his cell, marking the first time such a device has been used in the Wisconsin Department of Corrections prison system against a prisoner. Plaintiff has sued defendants under 42 U.S.C. § 1983, alleging that they

---

[1] Originally, plaintiff named Vickie Manderfield and Marion Hartmann as defendants and identified one defendant as "Janet Brown." However, pursuant to the parties' stipulation, dkt. #69, plaintiff's claims against Manderfield and Hartmann have been dismissed. Moreover, Janet Brown has changed her name to Janet Fischer. I have amended the caption accordingly.

1

used excessive force in violation of the Eighth Amendment when they deployed the stinger grenade in his cell to get him to follow orders.  In addition, he alleges that they performed an abusive strip search following the deployment of the stinger grenade, also in violation of the Eighth Amendment.

Defendants have moved for summary judgment, arguing that neither the deployment of the grenade or the strip search violated plaintiff's rights under the Eighth Amendment.  Plaintiff has filed a cross motion for summary judgment on his claims related to defendants' use of the grenade.  As to defendant Gerl, who deployed the grenade, and defendant Esser, who performed the strip search, I will deny their motions for summary judgment.  In weighing the factors relevant to deciding whether defendant Gerl's use of force was excessive in violation of the Eighth Amendment, a reasonable jury could find either that defendant Gerl deployed the stinger grenade maliciously and sadistically or that she did so in a good faith attempt to restore order, which means that the question cannot be decided on motions for summary judgment.  The same conclusion applies to plaintiff's strip search claim against defendant Esser:  the parties dispute key facts regarding the invasiveness of the strip search that defendant Esser performed on plaintiff.  Because a determination whether defendant Esser violated the Eighth Amendment hinges on these disputed factual issues, that matter will have to be decided by a jury.

The rest of plaintiff's claims involve defendants who were not involved directly in the

alleged Eighth Amendment violations.  Because plaintiff has failed to adduce evidence that would allow a reasonable jury to find that these defendants violated the Eighth Amendment for their alleged involvement in the cell extraction and strip search, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment on plaintiff's remaining claims.  Although defendants also move for summary judgment on plaintiff's "claims" against defendants Schneiter and Huibregste, plaintiff is not asserting any claims against them; they are named for the sole purpose of providing an avenue for injunctive relief in the event plaintiff prevails on his claims at trial.  Therefore, defendants' motion for summary judgment will be denied as unnecessary as to plaintiff's claims against defendants Schneiter and Huibregste and these defendants will remain in the case for the limited purpose of providing injunctive relief.

Before turning to the facts, a word about procedure is in order.  Plaintiff disputes a number of defendants' proposed findings of fact on the ground that defendants cite their affidavits describing the incident in greater detail than they originally described the incident in their reports.  However, plaintiff does not identify inconsistencies between the affidavits and the incident reports or point to glaring omissions in the earlier incident reports.  At most, he shows that defendants failed to include a number of minor details in their incident reports.  At trial, plaintiff may challenge the credibility of these witnesses in light of their lack of completeness; however, for the purpose of deciding the parties' motions for summary

3

judgment, I will treat as undisputed those proposed findings of fact in which defendants describe details not included in their incident reports. From the parties' proposed findings of fact and the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. Parties

Plaintiff Raynard Jackson is a prisoner at the Wisconsin Secure Program Facility. Defendant Peter Huibregste is the warden at the Wisconsin Secure Program Facility and defendant Richard Schneiter is the Correctional Services Manager for the Wisconsin Department of Corrections. At all times material to this action, the remaining defendants were prison officials at the Wisconsin Secure Program Facility in the following positions (some have since retired or changed position): defendant Gary Boughton was security director; defendant Joan Gerl was a lieutenant; defendant Todd Sawinski was training captain and commander of the institution's emergency response unit; and defendants Dane Esser, Thomas Brown, Janet Fischer (formerly  Janet Brown), Leonard Johnson, Robert Shannon, Jeff Rewey and Thomas Taylor were correctional officers.

### B. March 26, 2005 Cell Extraction

1. Events leading up to cell extraction

4

On March 26, 2005, plaintiff was housed in cell E-320 on "Echo Unit" at the Wisconsin Secure Program Facility. At the time, plaintiff was 24 years old and weighed 135 pounds. At about 3:00 p.m., defendant Fischer told defendant Gerl that plaintiff had been given a warning for sexual conduct. Defendant Gerl reviewed plaintiff's behavior log and decided to demote plaintiff to a lower security status and place him on a "back of cell" security precaution. At about 6:00 p.m., plaintiff was told he was being demoted and was removed from the cell to be escorted to a strip cell. At first, plaintiff refused orders to display his hands, but two correctional officers were able to talk plaintiff into complying and he was placed in restraints.

At the strip cell, plaintiff removed his own clothes and staff were able to perform a visual search of his body. Meanwhile, officers inspected plaintiff's cell and removed items such as books, magazines and personal letters so that the number of his personal items would conform with the requirements set by his reduced security status. No contraband or weapons were found on plaintiff or in his cell and plaintiff was returned to his cell without incident.

At about 9:00 p.m., defendant Johnson noticed that plaintiff had completely covered the shutter window to his cell door with paper. There was a note on the window that read: "Y'all will be suiting up tonight, run on in here. Let's play. Gangsta." In addition, Johnson noticed that water was coming into the corridor from under plaintiff's door.

5

Plaintiff's cell had a window in the door and skylights at the rear of the cell.  The window opening contained a metal T-bar and the window was covered by a hinged window shutter that could be opened with a key from outside the cell.  The cell did not have a camera.  It contained a toilet, hand sink, water fountain and shower, each of which had a timer that limited the amount of time an inmate could use water.  In addition, the cell floor contained a drain and water supply to the cell that could be shut off remotely.

Eventually, defendant Esser was told that plaintiff had covered his cell window with paper. He went into the maintenance area behind plaintiff's cell, climbed a ladder and viewed plaintiff from the skylight (which is located between 8 to 10 feet off the ground). Afterwards, defendant Gerl was told about plaintiff's behavior.  Plaintiff's water supply was shut off.  Around 9:40 p.m., defendant Gerl went to plaintiff's cell, where she saw the paper covering plaintiff's window (including the note)  and noticed that the floor near the cell was wet and that staff had placed towels on the floor.

Defendant Gerl asked plaintiff why he had covered his windows.  He responded by yelling at her, telling her, "Go suit up.  Let's play!"  Gerl told plaintiff that he would be placed on an "Obstructing View of Cell" security restriction and ordered plaintiff to clear his window and comply with being restrained and removed from his cell.  Plaintiff yelled, "Fuck you!  Go suit up!  Come in and get me!"

Defendant Gerl told plaintiff that, because his window was covered and his floor

6

flooded, she would likely use incapacitating agents before performing a cell entry to remove him.  Plaintiff responded by laughing.  Because plaintiff has asthma, staff from the Health Services Unit recommended to defendant Gerl that incapacitating units not be used "in any possible use of force situation involving" plaintiff.  Defendant Gerl left the unit to confer with defendant Boughton, the acting duty officer for the evening and the institution's security director.

2.  <u>Decision to use stinger grenade</u>

Because plaintiff was unwilling to cooperate by removing the paper from his window and allowing restraints to be placed on him, defendants Gerl and Boughton and captain Gardner met to discuss a planned use of force against plaintiff.  Defendant Gerl told defendant Boughton that plaintiff had covered his window and flooded his cell and that it would be unsafe for officers to enter plaintiff's cell to extract him. In addition, she told Boughton that incapacitating agents were "contraindicated." Both Gerl and Boughton knew that air tasers could not be used on the plaintiff pursuant to a settlement agreement. Defendant Gerl suggested that a "#15 Stinger Grenade" be used to extract plaintiff from his cell.

The #15 Stinger Grenade is a type of explosive device.  Upon detonation, the stinger grenade creates a bright flash of light, emits a loud blast accompanied by smoke and fires

7

180 rubber balls in a 50-foot radius. The stinger grenade is used most often as a crowd management tool, and, according to the manufacturer, is designed to "psychologically and physiologically maximize less-lethal force against the most stubborn of crowds." The manufacturer's Material Safety Data Sheet states that the stinger grenade "can cause eye, hearing and bodily injury if used improperly" and directs users to wear goggles, hearing protection and gloves. The data sheet states that the grenade is incompatible with water because chemicals in the device react with water to produce hydrogen gases that may cause explosion.

Defendant Gerl told defendant Boughton that she had been trained on the use of the stinger and was certified to use it. At the time, defendant Boughton had never used or been trained in the use of the stinger. Defendant Gerl had received her training from defendant Sawinski, the facility's training captain. Defendant Sawinski recalls conducting at least two emergency response unit classes in which he trained students (including defendants Gerl and Esser) in the use of the stinger. In his classes, defendant Sawinski taught his students that the stinger could be used in cells. He had never tested a stinger grenade in a closed cell, but during training he deployed a stinger grenade into a shed with no one inside. At some point, defendant Sawinski became aware of the dangers associated with using a stinger grenade in the presence of water, but did not train students about the danger. Moreover, although he had been provided an extensive outline detailing the dangers of using a stinger grenade, he

8

did not provide copies of the outline to persons attending his classes or prepare any other training materials.  During one of the training sessions, defendant Gerl watched defendant Sawinski deploy a stinger grenade in an empty shed and she deployed a grenade in an open field at a distance of twenty yards.

Before defendant Boughton decided whether a stinger grenade could be used against plaintiff, he and defendant Gerl went to Echo Unit and talked to plaintiff.  When they arrived, the paper was still covering the window and the floor outside the cell was still wet. Boughton tried to talk to plaintiff, but plaintiff kept yelling, "Go suit up!"  Boughton told plaintiff to clear his window and comply with removal from the cell, to which plaintiff responded, "Go suit up.  Come in and get me."  Defendant Boughton concluded that plaintiff was not going to cooperate.

At some point, defendant Boughton reviewed Department of Correction Security Internal Management Procedures and sections of the Wisconsin Administrative Code governing the use of force to determine whether the stinger grenade was approved for use by the Department of Corrections.   In addition, defendant Boughton reviewed the Department of Corrections' "use of force option continuum."

The Department of Corrections classifies the stinger grenade as an "intermediate weapon," and more specifically, a "specialty impact munition."   According to the department's policies, use of intermediate weapons is appropriate

9

> to control a violent subject and reduce the need to escalate to a higher force
> option in accordance with DOC 306, S.I.M.P. #22 Use of Force . . . only if
> the user of the force reasonably believes it is immediately necessary to realize
> one of the following purposes: [t]o prevent death or bodily injury to oneself
> or another . . . ; [t]o change the location of an inmate; . . . [t]o control a
> disruptive inmate; to prevent unlawful damage to property; or [t]o enforce a
> departmental rule, a posted policy or procedure or an order of a staff member.

Specialty impact munitions are described as "extended range impact weapon[s], they are to be used to control a violent subject, and reduce the need to escalate to a higher force option." In addition, department policy cautions that "[s]pecialty impact munitions are a form of less lethal force, in all respects; the manufacturer safety and distance instructions shall be followed."

The department's "use of force option continuum" describes the recommended "progression of force" officers should use "based on the perceived level of threat." The continuum includes 1) presence; 2) dialogue; 3) empty hand control (use of escort and compliance holds); 4) intermediate weapons; and 5) deadly force.

After reviewing the department's policies and administrative rules, defendant Boughton authorized the use of force, including the stinger grenade, if necessary to remove plaintiff from the cell. Before he did so, he did not review the manufacturer's information about how the stinger grenade was used or its dangers. He was not aware that it was dangerous to deploy a stinger in the presence of water. He relied on defendant Gerl's statement that she had been trained in its use.

10

A nurse from the health services unit, Vickie Manderfield, learned that a stinger grenade might be used.  She was concerned that, upon detonation, the high pressured rubber balls in the stinger grenade might hit plaintiff in the eye and cause him to lose vision, so she asked defendant Gerl, "Is he going to cover his face?  Is he going to be warned?"  Defendant Gerl responded that plaintiff would be warned.  (Although Manderfield does not recall exactly what respondent Gerl told her, she recalls being satisfied with the response.  She said she would not have been satisfied unless Gerl had assured her that plaintiff would be warned.)

3.  Use of the stinger grenade

Once defendant Boughton authorized the use of force, defendant Gerl assembled a cell extraction team, which included defendants Fischer, Esser, Johnson, Rewey, Shannon and Taylor.  Defendants Esser, Rewey, Shannon and Taylor were dressed in full riot gear.  Each wore a helmet with a face shield; a mouthguard; a stab proof "turtle suit" that covers the front and back of the torso; elbow pads; gloves; a jockstrap with cup; thigh pads; shin guards; and boots.  In addition, defendant Esser had a baton; defendants Rewey and Taylor had padded shields; and defendant Johnson had a large "control shield" that could be used to create a barrier between a prisoner and staff.

After the team put on the proper equipment, they were briefed.  They were told that

11

they could not use incapacitating agents because of plaintiff's medical condition and that they might be deploying the stinger grenade if force was necessary. Defendant Fischer videotaped the incident from the front of the cell and defendant Brown went to the maintenance area to observe plaintiff through the skylight and videotape the incident from that perspective. (As it turned out, defendant Brown was not successful in videotaping the incident.) From the skylight, defendant Brown was able to observe plaintiff throughout the incident and communicate his observations to defendant Gerl.

At approximately 10:11 p.m., the cell extraction team assembled at plaintiff's cell front for a "show of force." Defendant Gerl told plaintiff that she had authorization to use force to remove him from the cell and performed a "test arc" with a taser so that plaintiff could hear the device being used. She also told plaintiff that she was armed with a stinger grenade. Next, she gave plaintiff a direct order to uncover the window and comply with being restrained and removed from the cell; defendant Esser gave the same order. Through the hinge of the trap, defendant Esser could see plaintiff walking around in the cell, but plaintiff did not respond.

Defendant Gerl checked plaintiff's status from defendant Brown's perspective (at the skylight) by calling Brown on the radio. Defendant Brown reported that plaintiff was at the cell door near the trap and "appeared [to be] concealing something in his hand." At some time before the grenade went off, defendant Brown saw plaintiff crouching at the front of

12

the cell with his left hand extended and his right hand clenching the waistband of his pants in a manner that suggested he might be concealing a weapon or other item.

After defendant Brown reported that plaintiff appeared to be concealing something in his hand, defendant Gerl and the team agreed to open the cell trap door, place a control shield in front of it and look in. Defendant Gerl saw plaintiff standing directly in front of the trap facing the door. Defendant Esser told plaintiff to step away from the trap; plaintiff refused and shouted, "Come on in." Esser told plaintiff that the team would not enter the cell. Because plaintiff was blocking the cell door trap with his body, Gerl did not deploy the stinger at that time, instead ordering staff to close the trap.

After discussing their options, defendant Gerl and the team resumed their positions and opened the trap door. Defendant Esser repeatedly ordered plaintiff to back up, but he refused. Defendant Gerl saw that plaintiff had his fists clenched and was standing with his back and left foot closest to the door. Plaintiff yelled, "Come on in, fuckers. Y'all got all that shit and you can't come in here."

Defendant Gerl moved from the left of the open trap to the right. Defendant Esser feinted with a baton to determine plaintiff's response while defendant Gerl feinted with the stinger grenade. At that time, defendant Esser saw plaintiff's hands right in front of the trap and saw no weapons in them. After some feinting by defendants Esser and Gerl, defendant Gerl dropped the stinger grenade into the cell and defendant Taylor closed the trap quickly.

13

Defendant Gerl moved vaway from the cell quickly after she deployed the stinger grenade.

4. Effect of the stinger grenade

About one second after the stinger grenade was deployed, it exploded, producing a bright flash and a loud bang. Even from outside plaintiff's closed cell, the bang sounded like a 12-gauge shotgun being fired. The cell filled with smoke so thick that defendant Brown was not able to see anything in plaintiff's cell, including plaintiff, for 10 to 15 seconds after the explosion. The unit fire alarms sounded and air handlers activated to clear away the smoke. The force of the explosion can be seen as a shudder on the videotape. The door to plaintiff's cell "[shook] a little bit" from the explosion.

After the blast, plaintiff was holding his hands to his ears and appeared to be in physical pain and disoriented. For a period of months after the incident, plaintiff experienced drainage from one of his ears and ringing in his ears, later diagnosed as tinnitus. Even now, plaintiff experiences tinnitus, especially when there are loud noises. In addition, when the grenade was deployed, plaintiff twisted his right knee while trying to turn away from the grenade. He felt a sharp pain in the inner part of his knee and experienced numbness in his leg. Plaintiff has complained of chronic pain in his right knee and has been placed on a "no kneel" restriction. (The extent of plaintiff's injury appears to be in dispute. According to defendants, they have performed extensive testing on the knee and found no

14

significant inury; plaintiff states that he continues to suffer chronic pain from the incident.)
Since the grenade incident, plaintiff has had trouble sleeping, and has been prescribed
medication to help him deal with the sleep problems.

(Plaintiff attempts to propose facts that the grenade incident injured his eye as well.
To support this averment, he simply states that the detonation "resulted in an injury" to his
eye; he does not specify why he believes the detonation is to blame for his injury.  Against
this conclusory statement, defendants point out that plaintiff stated after the incident that
he did not recall whether a pellet had hit his eye and that he had complained previously
about eye problems almost identical to the ones he identifies now as caused by the grenade.
His medical record shows that he was diagnosed with a blister type lesion to the eye and had
complained of migraines and dizzy spells *before* the incident.  Because plaintiff's averments
regarding the cause of his eye injuries are not sufficiently specific, they will be disregarded.)

5.  Use of force in other cell extractions

On December 8, 2000, a prisoner weighing approximately 200 pounds was physically
extracted from his cell after having assaulted prison staff with a food tray.  The prisoner
covered all his windows with paper and told defendant Gerl, "You're gonna have to come in
and get me."  After defendant Gerl assembled a cell extraction team, the prisoner refused to
comply and shouted, "Come on in!"   Rather than use incapacitating agents or specialty

15

impact munitions, the cell extraction team entered the prisoner's cell and physically restrained and extracted him.

On July 11, 2001, another prisoner weighing approximately 200 pounds was physically extracted from his cell after he covered his cell windows and refused to comply. Rather than use incapacitating agents or specialty impact munitions, defendant Gerl and a cell extraction team entered the prisoner's cell and physically restrained and extracted him.

Inmates commonly put water on the floor of their cell in anticipation of a physical cell extraction. Defendant Esser is aware of cell extractions that have been conducted when water was on the floor. The use of the stinger grenade against plaintiff marks the first and only time the stinger grenade has been used against a prisoner in the Wisconsin Department of Corrections prison system.

## C.  Strip Search

After the grenade detonated, plaintiff did not leave his cell immediately. Defendant Esser ordered plaintiff to come to the door repeatedly. Plaintiff refused, yelling, "Come in here. Bitch . . . Fag. Suck my dick. You come in here and I'm gonna dump you on your head." Defendant Esser told plaintiff repeatedly that they would not enter the cell and ordered him to come out. Eventually, plaintiff agreed to come to the door and complied when defendants restrained him with wrist and leg restraints.

16

Defendant Esser asked plaintiff whether he was okay, but plaintiff did not respond. He was pat searched and taken to the Echo Unit health services unit room to see a nurse. During the walk to the health services room and while there, plaintiff continued to look at the staff members even after he was told to face forward.

Plaintiff was asked repeatedly whether he wanted the nurse to see him. Each time, he responded, "Strip me and put me in my cell." Plaintiff was not asked to strip on his own. Instead, defendant Gerl decided that plaintiff would be given a staff-assisted strip search and directed that he be taken to the unit observation cell, E-426. Cell E-426 is in the corner of the range, with no cell across from it. No inmates were in the hallway when the strip search was conducted.

Plaintiff was tethered to the front of the cell and brought into a kneeling position on a kneeling mat. Defendant Esser removed plaintiff's clothing with a pair of scissors. (The parties dispute what happened next. According to defendants, defendant Esser performed a manual search of plaintiff, but did not perform any sort of cavity search. Pursuant to department policy, such searches are conducted only by medical personnel. According to plaintiff, during the search, defendant Esser grabbed and squeezed plaintiff's testicles and penis, forced plaintiff's buttocks apart and forced a gloved finger into plaintiff's rectum. Although defendants contend that the video demonstrates conclusively that no such search took place, I disagree. During certain moments of the search, the video captures little more

17

than the backs of some of defendants, obstructing any view of what defendant Esser is doing to plaintiff during the search.  The video leaves open the possibility that defendant Esser performed the search in an inappropriate manner and plaintiff's affidavit testimony puts the matter in dispute.)

OPINION

A.  Use of Stinger Grenade During Cell Extraction

1. Excessive force claim against defendant Gerl

Plaintiff's core claim in this lawsuit is that defendant Gerl used excessive force against him in violation of the Eighth Amendment when she deployed a stinger grenade in his cell. For Eighth Amendment claims involving a prison official's alleged use of excessive force against a prisoner, the basic question is "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillan, 503 U.S. 1, 7 (1992) (citing Whitley v. Albers, 475 U.S. 312 (1986).  There is an argument that the excessive force standard is not appropriate for analyzing Eighth Amendment claims involving "planned" uses of force such as the one at issue in this case; this heightened standard derives from the notion that prison officials must often use force in "haste, under pressure, and frequently without the luxury of a second chance."  Whitley, 475 U.S. at 320.  However, the parties do not raise this issue, instead assuming that the

18

excessive force standard should be applied.  I will apply it, for the purpose of deciding the parties' cross motions for summary judgment.

To determine whether defendant Gerl used the stinger grenade in good faith or maliciously and sadistically, it is necessary to consider such factors as why force was needed, how much force was used, how much plaintiff was injured, whether defendant perceived a threat to safety of staff and prisoners and whether efforts were made to temper the severity of the force.  Whitley, 475 U.S. at 321.  Before weighing those factors, I consider defendants' initial argument: that the use of force against plaintiff was de minimis.  As the Court explained in Hudson, 503 U.S. at 9-10, although the absence of a significant injury alone does not bar a claim for excessive force, it will if the officer used no more than a minimal amount of force.  I am not persuaded that detonating a stinger grenade inside a cell can be considered de minimis.  It is not as minor a use of force as those at issue in the cases cited by defendant.  Outlaw v. Newkirk, 259 F.3d 833 (7th Cir. 2001) (slamming prisoner's hand in cuffport hatch); Lunsford v. Bennett, 17 F.3d 1574 (7th Cir. 1994) (bucket hit prisoner on head when guard poured water on prisoner); and DeWalt v. Carter, 224 F.3d 607 (7th Cir. 2000) (guard shoved prisoner into door frame).

Turning to the factors relevant to the excessive force analysis, I find that the facts in this case do not allow a conclusive determination whether defendant Gerl used the stinger grenade "in a good-faith effort to maintain or restore discipline" or "maliciously and

19

sadistically to cause harm." Certain factors weigh in favor of finding that defendant Gerl detonated the stinger grenade in plaintiff's cell in a good faith effort to get him to comply with orders. A narrow range of alternatives was available to restore discipline. Plaintiff had flatly refused to cooperate with the correctional officers, even after different threats and displays of force, and defendants could not use air tasers or incapacitating agents against defendant. As a practical matter, this left either 1) waiting, which did not appear to be working; 2) entering plaintiff's cell, which could be dangerous in light of defendants' limited visibility into his cell, the water on the floor and plaintiff's apparent threats made in the form of invitations for defendants to "suit up" and "come in and play"; 3) opening the window on plaintiff's cell door and attempting to pull off the paper, which could expose the correctional officers to injury or thrown objects and would not entirely resolve the problem; or 4) using a stinger grenade to force compliance.

However, other factors suggest that defendant Gerl's use of the stinger grenade was malicious and sadistic. First, even in light of the risks apparent to defendant Gerl, cell entry may have been a viable option. Plaintiff weighed 135 pounds and was not likely to pose much of a threat to the four defendants who would enter his cell. All were larger than plaintiff and wore armor. There was no suggestion that plaintiff had a weapon until *after* defendant Gerl sought and received authorization to use a stinger grenade. Even then, the likelihood of a weapon seemed minimal (he had been strip searched earlier that day) and the

20

danger caused by a weapon was mitigated by defendants' stab-proof armor. Although water covered part of the floor and paper obscured the window, cell entries had been performed against prisoners larger than plaintiff in similar circumstances in the past. Moreover, to the extent visibility was a concern, a correctional officer was able to see plaintiff from the skylights and communicate to the team. Plaintiff was not creating immediate danger to any officer or himself or damaging property, as defendant Brown was able to tell from his skylight position.

Next, the stinger grenade had never been used against a prisoner before (and has never been used since then). In addition, defendant Gerl deployed the stinger grenade knowing that plaintiff was close to the door and did not tell him that his eyes could be injured, even after she had told the nurse she would do so. Finally, the video shows defendant Gerl, who had detonated the stinger grenade in the past, dropping the grenade into plaintiff's cell and moving very quickly away from the cell, suggesting that she believed the force of the grenade could be substantial even outside the cell.

Despite the danger posed to plaintiff, a reasonable jury could find that defendant Gerl believed that the circumstances made using a stinger grenade an appropriate choice, either because she believed cell entry was even more dangerous or because she did not weigh the options as carefully as she should have. However, that is not the only conclusion a reasonable jury could reach. It could find that Gerl did not believe that cell entry posed a

21

serious risk, but still decided to use a stinger grenade, perhaps because she did not want to expose her team to even a minute risk of injury, or because she decided that she would not give plaintiff what he wanted (a cell entry), no matter the cost. Either of these inferences might allow a finding that defendant Gerl acted maliciously and sadistically in violation of the Eighth Amendment. Other facts, such as her failure to warn plaintiff of the risk of eye injury, may add support to such a finding.

Because a reasonable jury could decide either way on the matter, this claim must go to trial. I pause to note that defendants did not move for summary judgment on the ground that defendant Gerl is entitled to qualified immunity. They do mention qualified immunity in opposition to plaintiff's motion for summary judgment, in an apparent attempt to avoid waiver. Because I will deny plaintiff's motion for summary judgment, I need not consider the question whether defendants are entitled to qualified immunity. At any rate, so long as a jury could find that defendant Gerl acted with malice, she cannot establish grounds for qualified immunity (that she reasonably believed her actions were lawful). Hill v. Shelander, 992 F.2d 714, 718 (7th Cir. 1993).

2. Liability of other officers involved in stinger grenade incident

a. Defendant Boughton

Although defendants Gerl and Boughton are responsible for different acts related to

the deployment of the stinger grenade, the parties do not distinguish their roles, instead framing the issue exactly as the issue had been framed for defendant Gerl: did defendant Boughton "use" excessive force when he "used" the stinger grenade?  The facts show that defendant Boughton did not "use" the grenade, or even mandate its use; he simply authorized its use, along with other types of force, if necessary.  An argument could be made that, under these circumstances, the proper analysis is not whether he used excessive force, but rather whether he was deliberately indifferent to a substantial risk of serious harm, akin to cases in which prison officials are aware of a risk of assault but fail to reasonably respond to the risk.  Farmer v. Brennan, 511 U.S. 825, 829 (1994).  Otherwise, plaintiff's claim against Boughton could have been analyzed as a claim that he authorized use of the stinger grenade in "deliberate or reckless disregard" of plaintiff's right to be free from excessive use of force against him.  Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000).  However, the parties do not discuss either of these possibilities, so I will analyze plaintiff's claim against defendant Boughton under the excessive force standard.

The facts do not support a finding that defendant Boughton authorized use of the stinger "maliciously and sadistically."  As with defendant Gerl, defendant Boughton was aware that plaintiff was refusing to cooperate, had invited defendants to "suit up" to "come in and play," had covered his window and had put water on the floor.  He also knew that tasers and incapacitating agents could not be used against plaintiff.  However, unlike

23

defendant Gerl, he had never used a stinger grenade and had not been trained in its use, so he had to rely on defendant Gerl's statements that she had been trained and was certified in its use.

Defendant Boughton's review of the internal management procedures should have brought to his attention the warning that weapons such as the stinger grenade should be used only if "the user of the force reasonably believes it is immediately necessary," as well as the recommendation to use a continuum of force and the need to follow the stinger grenade's manufacturer's instructions.   However, he was told that defendant Gerl was trained and certified in its use and he did not authorize use of the stinger grenade "no matter the circumstances," but rather told Gerl she could use the grenade, or other types of force "if necessary."

In light of these facts, no reasonable jury could find that defendant Boughton acted "maliciously and sadistically" in authorizing use of a stinger grenade.   Therefore, plaintiff's motion for summary judgment will be denied and defendants' motion for summary judgment will be granted as to plaintiff's excessive force claim against defendant Boughton.

b.  Defendants Esser, Brown, Fischer, Johnson, Rewey, Shannon and Taylor

Plaintiff's claim against defendants Esser, Brown, Fischer, Johnson, Rewey, Shannon and Taylor is that they failed to intervene to prevent defendant Gerl from detonating the

24

stinger grenade.  A prison official may be liable under § 1983 for failing to intervene to stop the constitutional violation committed by another prison official.  <u>Miller</u>, 220 F.3d at 495. Although § 1983 requires personal responsibility for a constitutional violation, that requirement is satisfied whenever an official "acts or *fails* to act with a deliberate or reckless disregard of the plaintiff's constitutional rights."  <u>Id.</u> (quoting <u>Crowder v. Lash</u>, 687 F.2d 996, 1005 (7th Cir. 1982)) (emphasis in original).  When an official has a "realistic opportunity to step forward and prevent" a constitutional violation, he may be held liable for failure to do so.  <u>Miller</u>, 220 F.3d at 495.

The first problem for plaintiff's failure to intervene claims is that it is questionable whether these defendants had a realistic opportunity to prevent the use of the stinger grenade.  The usual situation involves a failure by a guard or officer to intervene to stop fellow guards or officers from beating a prisoner or suspect.  <u>Fillmore v. Page</u>, 358 F.3d 496, 505-06 (7th Cir. 2004); <u>Miller v. Smith</u>, 220 F.3d 491, 495 (7th Cir. 2000); <u>Yang v. Hardin</u>, 37 F.3d 282, 285 (7th Cir. 1994).  Plaintiff's situation is different.  His case involves a failure by lower-ranking officials to speak out against decisions made by higher ranking officials.  Defendants Esser, Brown, Fischer, Johnson, Rewey, Shannon and Taylor were not in charge of the cell extraction; Gerl was.  (Even defendant Esser, who was the team leader, was following defendant Gerl's orders.)  It is unclear how effective any lower-ranking officials' challenge to the use of the stinger grenade would have been.  Plaintiff does not

25

suggest that these defendants had a constitutional duty to refuse to follow orders or wrest the stinger grenade away from defendant Gerl.  At most, they should have spoken out against its use.  Perhaps defendant Gerl would have listened; perhaps not.

However, even if there was a "realistic opportunity" to speak out and prevent the use of the stinger grenade, no reasonable jury could find that the lower ranking officals' failure to speak out constituted deliberate or reckless disregard to plaintiffs' constitutional rights. Although the defendants were aware generally of the risks of deploying a stinger grenade, only Esser had received training in use of the stinger grenade.  More important, higher-ranking officials, defendants Gerl and Boughton, had made a decision to use the stinger grenade and the cell entry defendants were there to assist in executing that decision, not scrutinize their supervisors' decisions.

Prison officials should not be expected to challenge higher-ranking officials every time their discretionary decisions might be questionable or create a risk of harm.  As the Court of Appeals for the Seventh Circuit explained recently, prison officials cannot generally be held liable for failing to go beyond their job requirements to rescue a prisoner from a potential constitutional violation.  Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir. 2009) (complaint examiner not liable for dismissing untimely grievance instead of attempting to respond to request for medical care described in grievance).  As the court noted, "no prisoner is entitled to insist that one employee do another's job."  To hold the cell entry defendants

26

liable for failing to challenge defendants Gerl's and Boughton's decision to use a stinger grenade would be to require exactly that. Therefore, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment on plaintiff's excessive force claims against defendants Esser, Brown, Fischer, Johnson, Rewey, Shannon and Taylor.

c. Defendant Sawinski

Defendant Sawinski did not participate in the decision to use a stinger grenade against plaintiff or in the cell extraction that occurred on March 26, 2005. Plaintiff's claim against defendant Sawinski is that he failed to properly train defendant Gerl on the use of stinger grenade and that this inadequate training resulted in its alleged misuse. Plaintiff cites City of Canton v. Ohio, 489 U.S. 378, 390-91 (1989), for the proposition that defendant Sawinski could be held liable because his training program is "inadequate on its face." However, Canton sets out a standard for establishing *municipal* liability for the underlying torts of a city's employees, not a standard for determining an individual's liability. Farmer, 511 U.S. at 840-41; Collins v. City of Harker Heights, 503 U.S. 115, 124 (1992). For an individual to be held liable under § 1983 for an Eighth Amendment violation, he or she must have been aware of a substantial risk of serious harm and acted or failed to act despite that awareness. Farmer, 511 U.S. at 842. In most settings related to a prison officials' failure

27

to train, this would require that the prison official was aware that a lack of training or inadequate training created a substantial risk that prisoners could suffer serious harm but failed to provide adequate training despite that awareness.  Cf. Weiss v. Cooley, 230 F.3d 1027, 1033 (failure to implement classification system for dangerous inmates analyzed under deliberate indifference standard).

Of course, there is one more wrinkle in this case.  Defendant Sawinski was providing training related to prison officials' use of force.  In this setting, even with proper training, prison officials may use force that will cause serious harm to prisoners.  It would make no sense to hold a trainer liable for training guards to use such force if their use of force is found to be justified under the Whitley standard.  In use of force settings, therefore, a prison official's failure to train is better analyzed under a standard similar to that applied in the failure to intervene setting:  did the official provide inadequate training or fail to provide training "with a deliberate or reckless disregard of [prisoners'] constitutional rights." Miller, 220 F.3d at 495.  To be held liable under § 1983, a trainer must be aware that inadequate training or lack of training on the use of force is likely to lead to constitutional violations and nonetheless fail to provide proper training.

Nothing in the record would allow a reasonable jury to find that defendant Sawinski provided inadequate training on the use of the stinger grenade with a deliberate or reckless disregard to prisoners' constitutional rights.  There is no suggestion that defendant Sawinski

encouraged the use of stinger grenades without regard to the necessity of their use or that he encouraged trainees to disregard of the policies governing the use of force.  Defendant Sawinski would have no reason to believe the grenade would be used in any setting except when intermediate weapons such as the stinger grenade were authorized under prison policy.

Plaintiff points out that defendant Sawinski advised trainees that the stinger grenades could be used in a cell and did not tell them of the dangers of using the grenade in the presence of water.  However, these alleged failings could establish deliberate or reckless disregard only if defendant Sawinski knew that using a grenade in a cell or in the presence of water would likely be an excessive use of force even where intermediate weapons would otherwise be justified.  Nothing in the record supports such a finding.  To establish defendant Sawinski's liability, plaintiff had to adduce evidence that a stinger grenade is simply too dangerous to ever justify using one in a cell or in the presence of water and that defendant Sawinski knew it.  Although plaintiff explains generally the effect of the stinger grenade and submits evidence that the use of the grenade in the presence of water could cause explosion, the evidence falls short of showing that use of the stinger grenade in these settings was too dangerous.  Because plaintiff has failed to adduce evidence from which a reasonable jury could find that defendant Sawinski's failure to train violated the Eighth Amendment, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment on plaintiff's claim against defendant Sawinski.

B. Strip Search

As the Court of Appeals for the Seventh Circuit has recognized, although prison officials are entitled to perform strip searches in a manner that furthers some "legitimate penological purpose," they may not perform them "in a manner designed to demean and humiliate" the prisoner.  Doing so could make them liable under the Eighth Amendment for "wanton infliction of psychological pain."  Calhoun v. DeTella, 319 F.3d 936, 940 (7th Cir. 2003).

Defendants have moved for summary judgment on plaintiff's strip search claims, contending that the manner in which defendants performed a strip search on plaintiff was not designed to demean and humiliate plaintiff, but rather carried out for a legitimate penological purpose.  Plaintiff contends that he should have been given an opportunity to strip down on his own so that defendants could perform a visual inspection of his person rather than be subjected to a manual search.  That argument goes nowhere.  As defendants point out, defendants decided to manually strip search plaintiff after he had been resisted following orders along every step of the way, despite defendant Gerl's use of the stinger grenade.  Even after he was taken out of the cell he continued to refuse to follow orders, looking at defendants despite repeated orders to face forward.  There is no question that defendants had a legitimate penological purpose in performing a manual inspection rather than allowing plaintiff to strip on his own.  Whatever right plaintiff had to perform his own

30

strip search he lost by refusing to follow orders.

Next, plaintiff's argument that the strip search should not have been performed where it was is unpersuasive. Although defendants performed a strip search in front of a cell rather than inside the cell, it is undisputed that the cell was not in an area widely visible to prisoners, but rather at the end of a hall with no cell across from it. Nothing about these circumstances suggests the manual inspection was performed to demean and humiliate plaintiff.

What saves plaintiff's claim are his disputed averments that defendant Esser squeezed his penis and testicles and performed a body cavity search on him. If a jury believes plaintiff, they could infer that defendant Esser performed the search in a manner that was designed to humiliate plaintiff rather than for any legitimate reasons. There would appear to be no reason to squeeze plaintiff's sexual organs during a search. In addition, although a body cavity search may have been justified under the circumstances, defendants admit that their policy is to require that such searches be performed by medical staff. Thus, if defendant Esser performed this search, it was in violation of policy, bolstering the possibility that it was not done for legitimate reasons, but to humiliate plaintiff. Defendants provide no alternative explanation for the invasive nature of the search because they deny that it ever happened. Therefore, this is a matter that the jury will have to decide. For that reason, I will deny defendants' motion for summary judgment as to defendant Esser.

Plaintiff does not oppose defendants' motion for summary judgment as to his strip search claims against defendants Boughton and Brown because neither was involved in the search. However, the parties appear to assume that the remaining defendants' liability should rise and fall with plaintiff's claim against defendant Esser. Perhaps this would be the case if plaintiff had been correct that the unconstitutionality of the search arose in part from the location of the search or from the fact that he was not given an opportunity to strip down himself. Now that I have rejected those theories, what is left of plaintiff's claim is that, during the manual search, defendant Esser squeezed plaintiff's sexual organs, spread his buttocks and stuck his finger in the anal cavity. It is hard to see how any of the other defendants could be held liable for defendant Esser's behavior. At most, it would be for failure to intervene, but what realistic opportunity did any of the remaining defendants have to prevent defendant Esser from performing these acts? There is no evidence that they had any reason to know defendant Esser would perform the squeeze or body cavity search and the video demonstrates that, if these things happened, they happened very quickly. Because it would seem impossible for plaintiff to prevail on a claim that defendants Gerl, Taylor, Rewey, Shannon and Fischer failed to intervene in "reckless disregard" for his constitutional rights, I will grant defendants' motion for summary judgment as to plaintiff's claim against these defendants as well as his claim against defendants Boughton and Brown.

C.  Defendants Schneiter and Huibregste

Defendants moved for summary judgment on plaintiff's claims against defendants Schneiter and Huibregste.  However, as plaintiff explains, he is not asserting any claims against these defendants; rather, they have been named because they are high-ranking officials and plaintiff is requesting injunctive relief related to defendants' alleged Eighth Amendment violations that he believes they could provide.  Therefore, I will deny as unnecessary defendants' motion for summary judgment as to plaintiffs' claims against these defendants.  These defendants will remain in the case so that plaintiff may seek injunctive relief against them in the event that he prevails at trial.

ORDER

IT IS ORDERED that:

1.  The motion for partial summary judgment filed by plaintiff Raynard R. Jackson, dkt. #89, is DENIED.

2.  The motion for summary judgment filed by defendants Joan Gerl, Gary Boughton, Tod Sawinski, Dane Esser, Thomas Brown, Janet Fischer, Leonard Johnson, Robert Shannon, Jeff Rewey, Thomas Taylor, Richard Schneiter and Peter Huibregste, dkt. #72, is DENIED as to plaintiff's claims that, during a cell extraction on March 26, 2005,

33

defendant Gerl violated plaintiff's Eighth Amendment rights by deploying a stinger grenade into his cell and defendant Esser violated plaintiff's Eighth Amendment rights by performing an invasive strip search.

3.   Defendants' motion for summary judgment, dkt. #72, is GRANTED as to plaintiff's claims that:

a.   Defendant Boughton violated plaintiff's Eighth Amendment rights by authorizing use of a stinger grenade during a March 26, 2005 cell extraction;

b.   Defendants Esser, Brown, Fischer, Johnson, Shannon, Rewey and Taylor violated plaintiff's Eighth Amendment rights by failing to intervene when defendant Gerl deployed a stinger grenade into plaintiff's cell;

c.   Defendant Sawinski violated plaintiff's Eighth Amendment rights by failing to properly train prison officials in the use of the stinger grenade; and

d.   Defendants Boughton, Gerl, Brown, Fischer, Johnson, Shannon, Rewey and Taylor violated plaintiff's Eighth Amendment rights by failing to intervene when defendant Esser performed an invasive strip search on plaintiff.

4.   Defendants' motion for summary judgment is DENIED as to plaintiff's claims against defendants Schneiter and Huibregste; they remain in the case for purposes of injunctive relief only.

5.  Plaintiff's complaint is DISMISSED as to defendants Boughton, Sawinski, Brown,

34

Fischer, Johnson, Shannon, Rewey and Taylor.

     6.  The clerk of court is directed to issue a writ of habeas corpus ad testificandum for the attendance of plaintiff Raynard R. Jackson at trial beginning on July 20, 2009.  Plaintiff should be at the courthouse no later than 8:00 a.m.

     Entered this 5th day of June, 2009.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge